THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No.  CR 18-115-RAJ |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| v. | ) | MEMORANDUM |
| | ) | |
| MELISSA GODSEY, | ) | |
| Defendant. | ) | |

Melissa Godsey, through Assistant Federal Public Defender Greg Geist, respectfully submits the following memorandum for his sentencing hearing, set on June 28, 2019, at 1:30 p.m. The plea agreement calls for the parties to "jointly agree to recommend that the appropriate term of imprisonment to be imposed by the Court at the time of sentencing is a term of twenty-four months and one day, this term to include the mandatory two (2) years for *Aggravated Identity Theft*." Dkt. 30 at p. 8.

Because, as Ms. Godsey argues, her guideline range falls within Zone B of the sentencing table, this Court may sentence Ms. Godsey to one month in prison with the remaining 23 months and 1 day on home detention. *See* U.S.S.G. § 5C1.1(c)(2). Such a sentence respects the need for deterrence but provides the Court with a humane approach when sentencing a defendant who has been able to wrestle back her life to become a productive mother while treating a substance use disorder with therapy and prescribed Suboxone.

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*  CR18-115RAJ)  - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    Ms. Godsey's proposed sentence is the only compassionate option that keeps her

2    children in a safe environment with their mother. Any other result is unjust and lacks

3    concern for Ms. Godsey's progress and the safety of her children. Ms. Godsey has been

4    on pre-trial release for a year. Since she received a Suboxone prescription, Ms. Godsey

5    has been free from drug use and the crimes that attach to her drug use. She is desperate

6    to continue her treatment with Suboxone, while living at Hope Place, because it is the

7    most effective way to reduce suicide because of withdrawal, reduce a post-release

8    overdose or death, reduce recidivism, and continue to help Ms. Godsey change her life.

9    Ms. Godsey is desperate for this Court to find a different path that allows her to

10   serve her "term of imprisonment" in an alternative manner that conforms with the plea

11   agreement. Sending Ms. Godsey to serve a long term of *actual* imprisonment serves no

12   legitimate purpose and effectively ignores what actually works to help Ms. Godsey and

13   her children. Fortunately, the guidelines contemplate a method to serve a term of

14   imprisonment that does not require more than a month in actual prison.

15   Therefore, Ms. Godsey requests the Court to order that she serve the complete

16   term of imprisonment, except for one month of actual imprisonment, at Hope Place on

17   home detention.[1] Additionally, Ms. Godsey requests the Court to order a voluntary

18   surrender date on September 30, 2019[2], with the possibility that she may request an

19   additional extension. An extended surrender date will allow Ms. Godsey to evaluate her

20   options for an appeal, a 28 U.S.C. § 2241 motion to address the conditions of her

21   confinement or the decisions of the BOP regarding the execution of her sentence (*See*

22   Dkt. 30 at p. 11), or a civil lawsuit naming the BOP or its personnel as defendants.

23   //

24   //

25

26   ---

[1] *See* U.S.S.G. § 5C1.1 (Imposition of a Term of Imprisonment).
[2] The government requests a voluntary surrender date in early September of 2019.

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

I.       **Ms. Godsey's history, characteristics, and the nature of the offenses.**

When Ms. Godsey committed the offenses, she knew she would be arrested sooner rather than later. She is a drug addict with mental health issues who has done everything within her power to avoid imprisonment and the related separation from her three young children. Exhibit 1. She acted without thinking about the long term consequences of her actions as a drug addict. Ms. Godsey committed the offenses to financially support a drug addiction. She made irrational choices due to poor long-term thinking skills caused by drug addiction and mental health issues.

Ms. Godsey was born in Edmonds, WA at Stevens Hospital on February 1, 1984 to Sheridan Godsey and Allen Godsey.[3] PSR at ¶ 44. Sheridan worked at Blue Cross in Mountlake Terrace for 26 years. Allen worked as an appliance salesman at Jack Roberts Appliance in Shoreline. Both of Ms. Godsey's parents were addicted to crack. PSR at ¶ 45. Sheridan passed away in 2012 from a heart attack. Sheridan was an alcoholic. Ms. Godsey has a good relationship with her father. He is no longer using drugs. Ms. Godsey has one older brother.

Ms. Godsey has blocked out much of her early childhood. She feels scared that she is unable to remember most of her years as a young girl. She does remember being a good kid who followed the rules. She performed well in school and church. She attended Evergreen Elementary in Mountlake Terrace. After elementary school, Ms. Godsey's family bought a home in Lake Stevens. When her parents purchased the Lake Stevens home, they were able to stay clean for a period of time. Melissa attended Lake Stevens Middle School.

---

[3] Ms. Godsey provided her DREAM application, updated DREAM application, and DREAM client letter to United States Probation Officer Andrea Porter. The facts contained in this section are the same or similar to the facts contained in the DREAM application materials.

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   When Ms. Godsey was in the 7th grade, her parents relapsed. This was the first
2   time she realized both of her parents were crack addicts. PSR at ¶ 46. Ms. Godsey was
3   thrown into a new life after she came to the realization that her parents regularly used
4   drugs. She was ashamed to go anywhere with her parents. Ms. Godsey did not want to
5   make any friends because of a fear that her parents would just scare the friends away
6   from her. She was afraid that any new friend would tell on her parents and Ms. Godsey
7   would be placed in the system. She felt alone, betrayed, and scared when she learned
8   her parents were drug addicts. To make matters worse, Ms. Godsey did not have anyone
9   else to talk with about her parents' drug issues.

10   Ms. Godsey started her freshman year at Lake Stevens High School in 1998.
11   PSR at ¶ 66. She felt a constant level of stress because of her parents' drug addictions.
12   Ms. Godsey tried to keep her mother away from the high school. She thought that she
13   would be removed from her parents' home if teachers realized the level of her mother's
14   addiction. Through the stress of living with two crack addicts, Ms. Godsey managed to
15   make the cheerleading team leading into her sophomore year. The team required
16   participants to pay fees. At the time, Ms. Godsey's parents were in the process of losing
17   their home. Her mother was in the process of losing her job. Ms. Godsey's father
18   eventually lost his job. Both of her parents were too deep into drug use to maintain
19   employment. As a result, Ms. Godsey was unable to pay the fees for the cheerleading
20   team.

21   In part, the stress from having two drug addicted parents caused Ms. Godsey to
22   drop out of school and move away from her home when she was just 15 years old. PSR
23   at ¶¶ 46, 48. She held different jobs, including at Cinnabon and Fred Meyer. PSR at ¶
24   68. She lived with a family and worked as their babysitter. PSR at ¶ 46. At that home,
25   Ms. Godsey was raped three times by the father who employed her. PSR at ¶ 46.

26

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    Ms. Godsey moved to a teen center for a short period of time but she felt out of

2   place. Next, she lived with one of her cousins. When she was 17 years old, Ms. Godsey

3   moved in with a boyfriend. She learned she was pregnant in February 2001 when she

4   was just 17 years old. PSR at ¶ 48. Her oldest son was born in October 2001. Her

5   boyfriend was not interested in being a father so Ms. Godsey moved to Indiana in

6   February 2002. She worked at a daycare facility while living with her son and a friend

7   she made from high school. After six months, Ms. Godsey moved back to Washington

8   and lived with her parents in an apartment. She did not like living with her parents

9   because they continued to use drugs.

10    When Ms. Godsey was 20 years old, she saved up money and, with government

11   assistance, moved into an apartment in Arlington. PSR at ¶ 48. She lived with her son

12   and worked at a daycare facility. Ms. Godsey felt depressed and alone. She noticed how

13   happy a neighbor acted all the time. When Ms. Godsey was 21 years old, the neighbor

14   introduced her to methamphetamine. PSR at ¶ 49. At that point in her life, Ms. Godsey

15   only tried marijuana a few times and she did not like it.

16    The first time she tried meth, Ms. Godsey felt sick because she was doing what

17   she hated – using drugs. She remembers being able to smell the meth coming out of the

18   pores of her skin. The drug use caused Ms. Godsey to fall into a deeper depression. A

19   few days later, the neighbor brought over more meth and Ms. Godsey used again. Ms.

20   Godsey recognizes that this was the period in her life when everything changed. She

21   lost her job because she did not show up for three straight days. She did not stop using

22   drugs because she felt like she found a cure for her sadness.

23    Between 2005 and 2009, Ms. Godsey continued to use meth. She engaged in

24   drug seeking behavior. Her boyfriend was an addict. She became pregnant with her

25   second child. While Ms. Godsey was pregnant, her boyfriend went to jail because he

26

1  physically assaulted her. Ms. Godsey continued to surround herself with men who

2  mentally and physical abused her and took advantage of her.

3          Previously, Ms. Godsey was arrested on December 6, 2006 when she was a

4  passenger in a car with two other men. She was 22 years old. According to the affidavit

5  of probable cause for Snohomish County case number 07-01-00685-5, she had

6  "methamphetamine sores on her face" and an abscess on her "tooth was consistent with

7  methamphetamine use." Ms. Godsey pled guilty on August 15, 2007 and was sentenced

8  on October 3, 2007 for two felonies – second degree identity theft and unlawful

9  possession of payment instrument. PSR at ¶ 35. She received a 38-day sentence but

10  already served eight days in custody. PSR at ¶ 35. She served the remaining 30 days on

11  home detention. The criminal activity occurred within just one year of Ms. Godsey's

12  first use of meth.

13          The criminal conviction and jail time did not deter Ms. Godsey's drug use and

14  the corresponding criminal activity. On September 25, 2008, detectives interviewed her

15  about her part in a check cashing scheme. The scheme involved about twenty suspects.

16  According to the Snohomish County affidavit of probable cause for case number 10-1-

17  00533-6, Melissa cashed fraudulent checks in July and August of 2008. During the

18  interview with detectives, Ms. Godsey wrote a statement and confessed to cashing

19  fraudulent checks.

20          Detectives interviewed Ms. Godsey, again, on September 26, 2008. She provided

21  more information in an "extensive statement." The affidavit listed two other co-

22  defendants. The affidavit was not signed until April 2, 2010 – about 18 months after the

23  detectives interviewed Ms. Godsey. In April 2009, or a full year before the affidavit

24  was signed, Ms. Godsey entered inpatient treatment at Evergreen Manor. She received

25  inpatient treatment until September 2009. Between September 2009 and September

26

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey*;   CR18-115RAJ)  - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

2010, she participated in Evergreen's intensive outpatient treatment. She lived in Everett, through housing provided by Evergreen, with her three youngest children.

Ms. Godsey focused on drug treatment and engaged with CPS. She took parenting classes, domestic violence awareness classes, and followed all treatment recommendations. Melissa continued to receive housing through Evergreen until September 2011. In order to maintain housing, Evergreen required Ms. Godsey to attend three NA or AA meetings a week, meet with a housing case manager once each month, and submit to random drug testing. She earned a GED and started taking classes at a community college in 2010. She earned a program certificate for digital illustration. The program lasted for two years. During college, Melissa earned money through employment at the college.

Ms. Godsey remained drug free between April 2009 and October 2014. PSR at ¶ 63. She completed college in 2012. PSR at ¶ 66. She volunteered at Garfield Elementary, where her two middle children attended school. She participated in Celebrate Recovery. She was a leader who facilitated a group meeting each week. Ms. Godsey focused on her recovery and raising her children.

Ms. Godsey had her fourth child in September 2013. After her child was born, Melissa realized something was wrong but did not know she was experiencing postpartum depression. PSR at ¶ 63. Simple tasks seemed difficult for Ms. Godsey. She stopped volunteering and dismissed her sober support system. She went to a doctor, who diagnosed Melissa with ADHD and prescribed her Adderall. PSR at ¶ 63.

Ms. Godsey believes the Adderall prescription was a significant factor in her relapse. PSR at ¶ 63. Additionally, she was in a physically and emotionally abusive relationship. Soon, Ms. Godsey was seeking more medication than her doctor had prescribed. Eventually, she found it easier to obtain meth than Adderall. She started

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey*;  CR18-115RAJ)  - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

using meth again in October 2014. Melissa started to smoke heroin about eight months prior to the instant federal arrest. PSR at ¶ 62.

Ms. Godsey started to spend time with people who were negative influences. She did not address the depression she started to feel. She lost her apartment in July 2017. Two of her children lived with an aunt and uncle. Her oldest child lived with his father since the child was 6 years old. Ms. Godsey would leave her youngest son with her father, who has been clean since approximately 2011. She used meth every day. She committed crimes to support her drug addiction.

When actively using, Ms. Godsey made poor decisions in an effort to obtain drugs. She placed herself in dangerous situations between 2014 and 2018. She was raped again in 2017. Ms. Godsey was in a car accident when her boyfriend beat her up while she was driving. During this period of time, Ms. Godsey engaged in the activities that led to her instant arrest and federal charges.

Ms. Godsey was arrested on May 23, 2018 and released from federal custody May 30, 2018. PSR at ¶¶ 3. Each of the offenses were non-violent and directly tied to her drug addiction. She was placed on electronic monitoring. Ms. Godsey relapsed on June 12. She contacted her probation officer on June 13 to report the relapse. She re-engaged with Evergreen but arrived with a staph infection, which required emergency room visits and walk-in clinic visits.

On June 14, she started a Suboxone program. Exhibit 2 at p. 1; PSR at ¶ 65. Ms. Godsey started living at Evergreen in Everett on June 14 with her then 4-year-old son. At Evergreen, she started inpatient treatment. Evergreen helped with her medical stabilization. She had weekly visits with her father and her two middle children visited on weekends. Ms. Godsey signed up for dialectical behavior therapy (DBT) and relationship counseling. DBT helped Melissa with coping skills and using real life tools to help her communicate. She participated in parenting classes, which included role

playing and trust building. Ms. Godsey engaged in daily group therapy. She visited with a mental health counselor and a chemical dependency counselor on a weekly basis.

Ms. Godsey continued with the Suboxone prescription and treatment but did not receive a mental health diagnosis or treatment. She felt like something was missing because of the lack of mental health support. Despite the efforts of the Evergreen staff, Ms. Godsey believed she needed to try something different.

Ms. Godsey transferred to Triumph Treatment in Yakima on July 27, 2018. PSR at ¶¶ 52, 56; Exhibit 3. She worked with a mental health counselor and a nurse. She started group therapy, parenting classes, mindfulness classes, and circle of security classes. Initially, Ms. Godsey had difficulty adjusting to some program rules but she believes that was partially a product of an undiagnosed mental health issue. Melissa started Moral Reconation Therapy (MRT). MRT helped Ms. Godsey get through an oppositional phase at Triumph. At the time, she wanted the rules to bend to her instead of following all the program rules. MRT helped Ms. Godsey learn the wisdom in following program rules.

Ms. Godsey realized there are limits and she was not going to be able to manipulate the rules. She understood the boundaries were in place for a reason. For example, one program rule does not allow participants to borrow clothes. Program staff advised Ms. Godsey that she broke a rule by borrowing a coat for her son on a cold day. She used what she learned to take corrective steps. Ms. Godsey talked with a staff member about obtaining a jacket for her son. The next day, her son had his own jacket. Ms. Godsey views this example as one way she utilized skills learned in MRT to provide for her son without violating the rules or acting in an oppositional manner.

Between August 2018 and November 2018, Ms. Godsey took choice theory courses and she started emotion coaching. These courses helped her guide her 5-year-old son through his emotions. She identified her son's feelings and helped him

verbalize the feelings in order to cope. Additionally, an outside agency provided a parent support group. The group helped Ms. Godsey problem solve and celebrate achievements. She enrolled in nutrition classes to help her create healthy meals for her son and maintain a healthy lifestyle.

At Triumph, Ms. Godsey's work with a mental health counselor has been crucial. She was diagnosed with bipolar disorder in September. PSR at ¶ 56. Initially, Ms. Godsey had difficulty accepting the diagnosis because her mother had the same mental health issue. Ms. Godsey and her counselor worked together to figure out the medications that would work well for Ms. Godsey. After a trial and error phase that lasted several months, Melissa started to take Suboxone, lithium, Strattera, Citalopram, and trazadone. With the medication, Melissa was able to fully engage in treatment. She maintained stability and calmness, which allowed her to think clearly and logically. She no longer feels an unhealthy urgency or intensity.

Linda Leavitt, Ms. Godsey's Probation Officer in Yakima, reported to counsel that Ms. Godsey was doing great. PO Leavitt said that Ms. Godsey's 5-year-old son was very attached to Ms. Godsey and Ms. Godsey started to work on mending the relationships with her other children. PO Leavitt believed Ms. Godsey's medication calmed her down and helped her realize how much the Triumph program helped her achieve her goals. PO Leavitt stated that Ms. Godsey was afraid to go to prison because of the fear that she will lose everything she has been working so hard to achieve.

Ms. Godsey returned to the Western District of Washington in April 2019. She was accepted into Hope Place on April 22, 2019. PSR at ¶ 52. The family taking care of her two middle children could no longer care for them so the children started to live with Ms. Godsey at Hope Place, along with her youngest son.

Ms. Godsey is doing very well at Hope Place, although there has been some debate between the Probation Office and Hope Place concerning Ms. Godsey's

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

medication assisted treatment (MAT) and Suboxone prescription. When Hope Place objected to Ms. Godsey's continued use of Suboxone, the Probation Office convinced Hope Place to allow Ms. Godsey to scale off the prescription. Unfortunately, when the Suboxone prescription levels reached too low, Ms. Godsey began to have suicidal thoughts and felt like she was going to relapse. PSR at ¶ 65. Since that time, she has been returned to a safe, but not ideal, Suboxone level.

Ms. Godsey fully intends to continue to with her MAT and Suboxone prescription. The necessity for her to continue with MAT and Suboxone is equally important if she serves time in the BOP because opioids are available in BOP facilities. Unfortunately, BOP policies do not allow treatment that includes Suboxone.[4]

## II. This Court should recommend the BOP to continue MAT, including Suboxone treatment, without interruption during the entire term of Ms. Godsey's incarceration.

Ms. Godsey should not be forced to discontinue the use of medications that saved – and continue to save – her life just because she is in a BOP facility.[5] She fears that she will use illegal drugs, if she is in BOP custody, because they will be offered to her and she will not be on MAT. Ms. Godsey fears she will relapse and die from an overdose.

According to a Massachusetts Department of Public Health study, the "opioid overdose death rate is 120 times higher for those recently released from incarceration compared to the rest of the adult population."[6] In 2017, there were 798 deaths involving

---

[4] *See* https://www.bop.gov/resources/pdfs/formulary.pdf at p. 17 ("Suboxone…will only be approved for detoxification, NOT for pain or maintenance therapy.")

[5] *See* https://www.themarshallproject.org/2019/01/29/when-going-to-jail-means-giving-up-the-meds-that-saved-your-life

[6] https://www.mass.gov/files/documents/2018/11/15/Chapter%2055%20report%20%28excerpt%29.pdf

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

an opioid in the state of Washington.[7] According to the Center for Disease Control and Prevention, a United States federal agency within the Department of Health and Human Services, opioids were involved in 47,600 overdose deaths in 2017.[8] An average of 130 Americans die every day from an opioid overdose.[9]

This Court and the government are aware of the opioid crisis within the Western District of Washington. In this District, the United States Attorney's Office regularly cites the harm and suffering that drugs cause to those who become addicted to opioids, including heroin.

This Court is in a unique position to request the BOP to continue to provide Ms. Godsey with non-controversial MAT. *See* Exhibit 4 at p. 3, 7-8. The Probation Office's drug and alcohol treatment specialist is a proponent of MAT. The correct manner to treat Ms. Godsey should not depend on whether she is in a BOP facility or in the community. If she is in a BOP facility, the BOP will likely discriminate against Ms. Godsey – based on her opiate use disorder – by failing to provide her with the medication that keeps her alive. The BOP should continue Ms. Godsey's MAT in the same manner she would be allowed to continue in the community.

Ms. Godsey is severely addicted to opioids, including heroin. She has a known substance use disorder. Exhibit 2 at p. 2. Ms. Godsey has been prescribed Suboxone since June 14, 2018 or just about two weeks after she was released from custody in the instant case. Exhibit 2 at p. 1. She currently receives MAT, with prescribed Suboxone, from Dr. Michael Hauke at Ideal Option in Everett. Exhibit 2; PSR at ¶ 65.

Ms. Godsey committed the instant offenses to support her drug addiction. According to Ms. Godsey, MAT is saving her life and allowing her to become a loving and responsible mother to her four children. While prescribed and taking Suboxone, she

---

[7] https://adai.washington.edu/WAdata/deaths.htm
[8] https://www.cdc.gov/drugoverdose/data/statedeaths.html
[9] https://www.cdc.gov/drugoverdose/epidemic/index.html

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

has no desire to use drugs and, in turn, no desire to commit criminal offenses to support a drug addiction.

Over the past several months, she tried to taper off of Suboxone in the event she had to serve a prison sentence inside a BOP facility. Unfortunately, when the prescription tapered too low, Ms. Godsey felt urges to use heroin and she contemplated suicide. PSR at ¶ 65. When the Suboxone levels increased, Ms. Godsey no longer felt urges to use drugs or commit suicide.

Ms. Godsey's request is logical because continuing MAT in the BOP will prevent a relapse while she is in the BOP. The continuity of MAT from the BOP to supervised release will eliminate Ms. Godsey's elevated overdose and death rate, which is 120 times higher for those recently released from incarceration.

Other courts agree with the logic behind continuing MAT in custody. A simple Internet search reveals the increasing number of jails and prisons – including jails and prisons in the state of Washington – that are implementing MAT, either voluntarily or as a result of litigation. *See* Exhibit 4.

For example, plaintiffs filed a civil rights lawsuit against Whatcom County and the Whatcom County Sheriff's Office for denying people with opioid use disorder with the medicine needed to treat addiction.[10] The case is pending in the Western District of Washington. *See Kortlever v. Whatcom County*, 2:18-cv-823-JLR (W.D. Wash.).

The *Kortlever* court set a final approval hearing on July 9, 2019. The parties submitted a settlement agreement requiring the Whatcom County jail to "allow inmates with existing MAT prescriptions for OUD, such as Suboxone, Subutex, or Vivitrol, etc., to continue on their prescription MAT as long as clinically indicated." Exhibit 5 at p. 6.

If Whatcom County can implement MAT for all of its inmates, the BOP should certainly be capable of implementing, based on a request from this Court, MAT for Ms.

---

[10] https://www.aclu-wa.org/cases/kortlever-et-al-v-whatcom-county

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1   Godsey. In fact, the BOP has implemented MAT, in the form of Methadone treatment,

2   for a prospective inmate. Exhibit 6. After alleging violations of the Eighth Amendment,

3   the Rehabilitation Act, and the Administrative Procedures Act, the BOP represented to

4   the court that the plaintiff would receive her prescribed methadone while incarcerated at

5   the Federal Medical Center in Carswell, Texas. Exhibit 6 at p. 1-2.

6          Based on the pattern of increasing access to MAT, this Court should request the

7   BOP to implement a plan that allows Ms. Godsey to continue drug treatment, through a

8   Suboxone prescription, during the entire period of her BOP incarceration. The request

9   should include a recommendation for placement in a facility that will allow Ms. Godsey

10  to continue MAT without interruption.

11         Ms. Godsey requests the Court continue her surrender date to September 30,

12  2019. Additionally, she requests the Court to order the BOP to provide a status update,

13  at the earliest possible date, to determine where Ms. Godsey will be incarcerated and

14  receive Suboxone treatment throughout the duration of her incarceration.

15  **III.    The Guideline calculations.**

16         Ms. Godsey has a number of objections to the PSR related to the offense level

17  and criminal history score calculations.

18  **A.  Ms. Godsey should receive a 4 level increase for the loss amount.**

19         Ms. Godsey objects to Paragraph 22 and the conclusion that a 6 level increase

20  should be applied for the loss amount. U.S.S.G. § 2B1.1(b)(1)(C), with its 4 level

21  increase, provides the correct calculation. Ms. Godsey financed a vehicle from CarMax

22  using a victim's personal information for approximately $22,000. But the loss to

23  CarMax, after it resold the vehicle for $17,599, was approximately $4,712. This correct

24  loss amount places the total loss above $15,000 and not more than $40,000, which

25  creates a 4 level increase instead of a 6 level increase.

26

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Ms. Godsey objects to the use of commentary to expand, rather than interpret, the guideline calculation. Although the commentary or Application Notes provide alternative methods for calculating the loss amount and the corresponding offense level increase, Ms. Godsey objects to the Court's use of the Sentencing Commission's commentary or Application Notes to define "loss" as a specific offense characteristic.

Courts should not defer to the Sentencing Commission when the Commission bypasses procedures to expand the meaning of the guidelines. "The rulemaking of the [Sentencing] Commission is subject to the notice and comment requirements of the Administrative Procedure Act." *United States v. Havis*, --- F.3d ---, 2019 WL 2376070 at *2 (6th Cir. June 6, 2019) (en banc) (citing *Mistretta v. United States*, 488 U.S. 361, 394 (1989)). "(C)ommentary to the Guidelines never passes through the gauntlets of congressional review or notice and comment." *Havis*, WL 2376070 at *3.

The Supreme Court held that the general rule regarding commentary interpreting the text of the guidelines was that "provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'"— i.e., the commentary is given what is commonly known as *Seminole Rock* or *Auer* deference. *Stinson*, 508 U.S. 36, 45 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Here, the commentary is an interpretation of the guideline and the guideline is similar to a regulation. But "*Auer* deference is warranted only when the language of the regulation was ambiguous." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). The language in U.S.S.G. § 2B1.1(b)(1) ("If the loss exceeded $6,500, increase the offense level as follows:") is not ambiguous. It is clear that the loss to CarMax is its actual loss of $4,712.

The Commission's use of commentary to expand the definition of "loss" deserves no deference. *See Havis*, WL 2376070 at *4. The commentary expands the

meaning of the guideline for loss amount. CarMax lost $4,712. CarMax does not claim that it lost more than $4,712. Because the commentary did not go through congressional review and the notice and comment requirements, the commentary may not expand the meaning or definition of loss. Therefore, the loss amount equates to CarMax's loss and not some other theoretical loss amount. A 4 level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(C), is appropriate.

**B.  A 2 level increase should not be applied because the offense did not involve more than 10 victims.**

Ms. Godsey did not possess all of the mail contained in her car on November 24, 2017. Ms. Godsey was arrested with Di Giacomo. Most of the items in the car belonged to Di Giacomo or others. Ms. Godsey objects to the conclusion that she possessed all of the items in the car. Without the mail items, the offense does not involve more than 10 victims.

**C.  A 2 level increase should not be applied because Ms. Godsey did not possess the items found in her car on November 24, 2017.**

Ms. Godsey objects to the 2 level increase, based on U.S.S.G. § 2B1.1(b)(11), listed in Paragraph 24 of the PSR. The Addendum to the PSR claims that Ms. Godsey possessed computers, printers, scanners, blank check stock, stolen mail, identification cards, and printed documents. The Addendum states that it "appears Ms. Godsey did have possession" of the items simply because they were found in her car and some of the items had Ms. Godsey's photo with personal information belonging to others.

The Addendum does not explain why the items in the car belonged to Di Giacomo, or others, rather than Ms. Godsey. Di Giacomo had access to the car and it is just as likely that he possessed the items instead of Ms. Godsey. The 2 level increase should not be included in the Court's calculation because there is insufficient evidence to demonstrate Ms. Godsey possessed the items listed in U.S.S.G. § 2B1.1(b)(11).

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**D. Ms. Godsey falls into a criminal history category I.**

After calculating Ms. Godsey's criminal history points, and taking into account an overstatement of her criminal history (U.S.S.G. § 4A1.3(b)(1)), the Court should find a criminal history category I. Ms. Godsey objects to the criminal history point calculation in the PSR.

Ms. Godsey objects to the 1 criminal history point listed in Paragraph 33 based on possession of a small amount of marijuana when Ms. Godsey was 22 years old. The conviction is nearly 12 years old and the underlying conduct is over 13 years old. Simple possession of small amounts of marijuana should never count as criminal history points. Sentences for local ordinance violations, loitering, speeding, public intoxication, and "offenses similar to them…are never counted." U.S.S.G. § 4A1.2(c)(2). Marijuana possession is less serious than speeding, public intoxication, or any of the items listed in U.S.S.G. § 4A1.2(c)(2). The simple possession of marijuana is a non-violent offense that does not put others at risk.

Possession of marijuana is legal in Washington. The governor of Washington signed SB 5605 on May 13, 2019 and the law becomes effective on July 28, 2019.[11] According to the law, Washington courts must vacate the record of conviction for misdemeanor marijuana offenses if an applicant was at least 21 years old at the time of the offense.[12] The new law means that marijuana possession is not a crime and, because it is not a crime, it should not count toward criminal history points. Ms. Godsey should not be penalized simply because the law becomes effective after the date of her federal sentencing.

The conviction in Paragraph 34 of the PSR, for a misdemeanor theft offense, is over 12 years old and the underlying conduct is over 13 years old. The conviction in

---

[11] https://app.leg.wa.gov/billsummary?BillNumber=5605&Year=2019&Initiative=false
[12] https://blog.norml.org/2019/05/14/washington-governor-signs-marijuana-expungement-bill-into-law/

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*  CR18-115RAJ)  - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Paragraph 35 of the PSR is nearly 12 years old, while the offense conduct is over 12.5 years old. The offenses occurred while Ms. Godsey was actively using illegal drugs.

Ms. Godsey objects to a 2 point calculation for the conviction in Paragraph 36 of the PSR. The Court sentenced Ms. Godsey to 3 months of confinement but permitted her to serve the sentence on home detention. Exhibit 7 at p. 4. She served the whole sentence on home detention. U.S.S.G. § 4A1.1 allows criminal history points for a "prior sentence of imprisonment." U.S.S.G. § 4A1.2(b)(1) defines a "sentence of imprisonment" as "a sentence of incarceration."

Application Note 2 of U.S.S.G. § 4A1.2 limits the scope for the term "sentence of imprisonment" because "(t)o qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence." Application Note 4 concludes that a "sentence which specifies a…non-incarcerative disposition as an alternative to a term of imprisonment…is treated as a non-imprisonment sentence." Because the court allowed Ms. Godsey to serve the sentence on home detention, the sentence resulted in a non-incarcerative disposition.

Ms. Godsey objects to the 1 criminal history point added in Paragraph 37. Only points for prior sentences count toward criminal history points. U.S.S.G. § 4A1.1(c). A prior sentence "means any sentence previously imposed…for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). Application Note 1 of U.S.S.G. § 4A1.2 limits the scope of the definition of prior sentence. It states that a "sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense. Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." The theft in Paragraph 37 is relevant conduct to the instant offenses. The theft was part of the same course of conduct or theft spree that occurred in 2017. *See* U.S.S.G. §

1  1B1.3(a); U.S.S.G. § 1B1.3, comment. (n.5(B)(ii)). The theft offense in Paragraph 37
2  does not count as a "prior offense" because it was relevant conduct and part of the same
3  course of conduct as the instant federal offenses. Because it does not fit the definition of
4  a prior sentence, the conviction in Paragraph 37 of the PSR does not count toward
5  criminal history points.

6      Overall, Ms. Godsey has 3 criminal history points, which falls in category II. All
7  of her convictions are related to drug addiction. As she has proven, Ms. Godsey does
8  not commit offenses when she is clean. She does not commit offenses when she is
9  prescribed Suboxone. Because "reliable information indicates [her] criminal history
10 category substantially over-represents the seriousness of [her] criminal history or the
11 likelihood that [she] will commit other crimes," a downward departure to category I is
12 appropriate.

13 **IV.   Conclusion**

14     If the Court agrees with Ms. Godsey's guideline objections, it will result in an
15 offense level of 9 and a criminal history category I with a guideline range of 4 to 10
16 months. The range falls within Zone B. A guideline range within Zone B permits "a
17 sentence of imprisonment that includes a term of supervised release with a condition
18 that substitutes community confinement or home detention…provided that at least one
19 month is satisfied by imprisonment." U.S.S.G § 5C1.1(c)(2). Therefore, Ms. Godsey
20 requests the Court to sentence her to 1 month in BOP custody with requests that the
21 BOP provide MAT and that she serve the remaining term of imprisonment – 23 months
22 and 1 day – on home detention at Hope Place.

23          DATED this 24th day of June, 2019.

24                         Respectfully submitted,

25                         s/  *Gregory Geist*
                           Assistant Federal Public Defender
26                         Attorney for Melissa Godsey

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

## CERTIFICATE OF SERVICE

2       I certify that on June 24, 2019, I electronically filed the foregoing document with

3   the Clerk of the Court using the CM/ECF system, which will send notification of filing

4   to all registered parties.

5

6                                    s/ *Barbara Hughes*
                                     Paralegal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENSE SENTENCING MEMO
(*US v. Melissa Godsey;*   CR18-115RAJ)  - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**