```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
    _____

    UNITED STATES OF AMERICA,          )
                                       )
                    Plaintiff,         ) CASE NO. CR18-115-RAJ
                                       )
    v.                                 ) Seattle, Washington
                                       )
    MELISSA GODSEY,                    ) June 28, 2019
                                       ) 1:35 p.m.
                    Defendant.         )
                                       ) SENTENCING
                                       )
    _____

                  VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE RICHARD A. JONES
                  UNITED STATES DISTRICT JUDGE
    _____

    APPEARANCES:


     For the Plaintiff:        STEPHEN HOBBS
                               United States Attorney's Office
                               700 Stewart Street, Suite 5220
                               Seattle, WA 98101


     For the Defendant:        GREGORY GEIST
                               Federal Public Defender's Office
                               1601 5th Avenue, Suite 700
                               Seattle, WA 98101


     Reported by:              NANCY L. BAUER, CCR, RPR
                               Federal Court Reporter
                               700 Stewart Street, Suite 17205
                               Seattle, WA 98101
                               nancy_bauer@wawd.uscourts.gov
```

1                              PROCEEDINGS
2    _____

3         THE CLERK:  This is the case of United States versus
4    Melissa Godsey, Cause No. CR18-115, assigned to this court.
5       Counsel, please make your appearances for the record.
6            MR. HOBBS:  Good afternoon, Your Honor.  Stephen Hobbs
7    for the United States.
8            THE COURT:  Good afternoon.
9            MR. GEIST:  Good afternoon, Your Honor.  Greg Geist
10   from the Federal Defender's Office, and I'm at counsel table
11   with Melissa Godsey.
12           THE COURT:  Good afternoon.
13           THE PROBATION OFFICER:  Good afternoon.  Andrea Porter
14   with U.S. Probation.
15           THE COURT:  Good afternoon.
16      As indicated, we are here for the sentencing of Ms. Godsey.
17   It is my practice to begin this proceeding by identifying all
18   the documents that I've reviewed and received, and those
19   documents include the following:
20      The presentence report prepared by Probation Officer Andrea
21   Porter, with attachments, and that includes victim-impact
22   statements; the United States Pretrial release report; the
23   government's sentencing memorandum and their recently filed
24   response to the defendant's motion.  The court also reviewed the
25   defendant's sentencing memorandum, with exhibits and a letter

 1   from the defendant; and the plea agreement.

 2       Counsel for the government, are you aware of any additional

 3   documents submitted that I did not state for the record?

 4           MR. HOBBS:  Did you receive the victim-impact letters

 5   that were associated with the PSR?

 6           THE COURT:  Yes, counsel.  I announced that already.

 7           MR. HOBBS:  Okay.

 8           THE COURT:  Have you reviewed the presentence report?

 9           MR. HOBBS:  I have, Your Honor.

10           THE COURT:  And my review indicates that there are no

11   outstanding objections from the government that require

12   resolution; is that correct?

13           MR. HOBBS:  Well, not an objection.  We are agreeing,

14   in paragraph 22, to reduce the plus-six enhancement to a

15   plus-four enhancement.

16           THE COURT:  I'll make that adjustment, counsel, in the

17   court's guideline calculations.

18       Counsel for the defendant, are you aware of any additional

19   documents that I did not state for the record?

20           MR. GEIST:  No, Your Honor.  Thank you.

21           THE COURT:  And, counsel, you've reviewed the

22   presentence report with your client?

23           MR. GEIST:  Yes, Your Honor.

24           THE COURT:  And my review indicates that there are

25   several objections that require resolution from the court,

1    correct?

2          MR. GEIST:  That is correct, Your Honor.

3          THE COURT:  Do you wish to make further argument on

4    any of those objections?

5          MR. GEIST:  I don't think I do, no.

6          THE COURT:  The court has had a chance to review all

7    the responses provided by Probation.  As opposed to going

8    through each one, the court will adopt the responses and find

9    that they were all proper and appropriate, and the objections by

10   the defense will be overruled, and that includes those

11   referenced in the memorandum and in the statement to the court.

12         I'll announce my conclusions now as to the appropriate

13   offense level and criminal history category.  For these

14   calculations, I've used the 2018 guidelines manual.

15         Counts 1, 2, 3, and 6 will be grouped, and Counts 4 and 5

16   will be grouped and scored in accordance with Guideline Section

17   2D1.2(d).  With respect to Counts 4 and 5, aggravated identity

18   theft has a mandatory term of 24 months and runs consecutive to

19   any other counts of conviction.

20         Group one is regarding the bank fraud in Count 6 for

21   possession of stolen mail.  The guideline for violation of this

22   type of offense begins with a base offense level of seven.  As

23   noted by counsel for the government, by their concession, the

24   specific offender characteristics under Guideline Section

25   2B1.1(b)(1)(C) allows a four-level increase, as the loss amount

1    was more than $15,000 but less than $40,000.  Therefore, a

2    four-level increase is applied.

3         The court also notes that two levels are added if the

4    offense involved more than ten victims.  The court so finds and

5    applies a two-level increase.

6         Under Guideline Section 2B1.1(b)11(A)(1), two levels are

7    added if the offense involved the possession or use of any

8    device-making equipment.  In this case, the defendant's

9    equipment and devices and fraudulent credit cards were with her

10   and had pictures with names not belonging to her.

11        There are no victim-related adjustments or adjustments for

12   role in the offense or for obstruction of justice.  This gives

13   us an adjusted offense level subtotal of 15.

14        Without Chapter 4 enhancements, the court next proceeds to

15   adjustment for acceptance of responsibility.  I find that, based

16   upon defense counsel's submissions, the defendant adequately

17   accepted responsibility.

18        I further find that the timeliness of her plea has given

19   the government the opportunity to more efficiently utilize its

20   resources; therefore, a three-level adjustment for acceptance of

21   responsibility is applied.

22        This gives us a total offense level of 12.  The defendant

23   has a criminal history category of three.  Her imprisonment

24   range is 15 to 21 months; Counts 4 and 5, 24 months to run

25   consecutive.  The supervised release range is three to five

1   years.  Probation, she's not eligible, and the fine range is

2   $7,500 to $1,750,000.

3       Counsel for the government, how do you wish to respond to

4   the court's calculations?

5           MR. HOBBS:  The government accepts those calculations,

6   Your Honor.

7           THE COURT:  Counsel for the defense?

8           MR. GEIST:  We maintain our previous objections, Your

9   Honor.  Thank you.

10          THE COURT:  So noted.  But otherwise, you accept them,

11  counsel?

12          MR. GEIST:  Yes, Your Honor.

13          THE COURT:  All right.

14      The next thing we'll proceed to is the recommendations from

15  the parties.  I'll hear first from counsel for the government,

16  then I'll hear from probation, then defense counsel, and the

17  defendant will be the last person to address the court.

18      Counsel for the government, your recommendation?

19          MR. HOBBS:  Thank you, Your Honor.

20      Consistent with the plea agreement, the government is

21  asking that you impose a sentence of 24 months on Counts 1, 2,

22  3, and 6, consecutive to the mandatory 24 months on Count 2.

23      Before I address sort of the substantive facts, briefly I'm

24  going to just focus my attention on the defense request that the

25  court has the authority to impose a one-month sentence, followed

1    by 23 months of home detention.  I was, frankly, surprised to

2    see that recommendation.  I think it's inconsistent with the

3    plea agreement.  It's clearly inconsistent with the mandatory 24

4    months of imprisonment.  And for the reasons I've set forth in

5    my response to the defense sentencing memorandum, I think it's

6    also inconsistent with the sentencing guidelines.

7         Twenty-four months becomes the guideline sentence.  That's

8    a Zone D enhancement, and home detention is not authorized.

9         Unless the court has any other questions, I'll rest on my

10   briefing on that issue.

11        THE COURT:  All right.  Thank you, counsel.  I have no

12   additional questions.

13        Probation?

14        MR. HOBBS:  I'm sorry.  That was on the first part.

15   May I just address a few more...?

16        THE COURT:  Certainly.

17        MR. HOBBS:  I apologize.

18        The court understands the facts of this case.  Ms. Godsey,

19   who the government acknowledges had a severe drug problem, went

20   on a lengthy criminal spree in which she was stealing people's

21   identities, using those identities to buy a car, to cash checks,

22   and to do other criminal activity.  She was in possession of a

23   very large amount of stolen mail.

24        Our recommendation below the guideline range -- well below

25   the guideline range, at 24 months and one day -- recognizes her

1    difficult upbringing, recognizes her drug addiction, recognizes

2    she has children, but it holds her accountable for her criminal

3    actions.

4         The last point I would like to make is, I have submitted an

5    amended order of forfeiture.  The court previously, at Docket

6    39, entered an order of forfeiture.  We have since been in

7    contact with CarMax and realize that they were able to sell the

8    car and, thus, recoup some of our losses.  The amended

9    forfeiture amount is $24,695.58.  I'd ask the court to enter

10   that order, so state on the record so it's been reflected in the

11   judgment, and I'm recommending our restitution request to the

12   same amount.

13        The plea agreement contains Attachment A that sets forth

14   the restitution.

15             THE COURT:  Counsel, would you state the numbers once

16   again?  $24,695?

17             MR. HOBBS:  And 58 cents.

18             THE COURT:  All right.  Thank you, counsel.

19             MR. HOBBS:  Thank you.

20             THE COURT:  Probation, any additional input?

21             THE PROBATION OFFICER:  We're recommending the minimum

22   sentence in the case, 24 months and one day custody, largely

23   based upon our recognition that the defendant, Ms. Godsey, has

24   made -- we want to recognize the changes that she has made

25   during her term on bond, and we think that they've been

June 28, 2019

1   substantial, and we are supportive of the directional path that

2   she's maintained.  In this case, we do have a mandatory minimum

3   sentence.

4           THE COURT:  All right.  Thank you.

5           THE PROBATION OFFICER:  Thank you.

6           THE COURT:  Mr. Geist?

7           MR. GEIST:  Thank you, Your Honor.

8       Ms. Godsey's father, her 12-year-old child, and her

9   13-year-old child are each in the courtroom here today, and I

10  think I'd like to address them first.

11          Melissa has made what has to be among the greatest

12  turnarounds on pretrial release -- at least that I have ever

13  seen -- and I do not know what more could have been expected of

14  her.

15          So her father, her children, they have a lot to be proud

16  of.  So does Melissa.

17          When Melissa is actively using drugs and she's undertreated

18  for her mental health issues, her bipolar disorder, she's,

19  clearly, someone who is not deterred from stealing in order to

20  obtain drugs.

21          If we look back at her history, even while she was

22  undertreated for her mental health issues, she wasn't using

23  drugs between 2009 and 2015.

24          She lost custody of her children around 2009, but she

25  worked hard to get them back into her life and for them to have

1   a mother, and that was during her period of sobriety between

2   2009 and 2015.

3       She entered a treatment program at Evergreen and she was

4   able to succeed there.  She lived there at Evergreen.  She

5   engaged in counseling and therapy.  And there was even a point

6   in time where she entered community college, finished up a

7   program there, and her future looked bright.

8       Her youngest son was born in 2013, and Melissa experienced

9   postpartum depression.  That eventually led to self-medicating,

10  and that self-medicating eventually led to full-blown drug use.

11      She didn't know it at the time, but she was medicating, I

12  believe, for a yet-to-be-diagnosed mental health issue, which is

13  bipolar disorder.

14      The outcome was easy to predict; that someone who is a drug

15  addict, who is feeling depressed, who is not getting treated for

16  bipolar disorder, a relapse was going to happen sooner or later.

17  That was easy to predict.

18      If Melissa could have done something back then, if she knew

19  what to do, if she was willing to accept the fact that she was

20  bipolar, I think she probably would have done something back

21  then about it.  But between the postpartum depression and the

22  self-medicating, I think that's how we end up where we are now.

23      She started using drugs, she stopped spending time around

24  the community that she built up, the positive community and the

25  positive influences, the people who celebrated her sobriety.

1    Instead, she turned to people who she could get drugs from,

2    people who also were willing to steal, people who were willing

3    to lie, and, frankly, people who didn't care about anything else

4    other than getting high.  That's where Melissa ended up.

5        She told me that her addiction caused her to prioritize her

6    drug use over everything else, and that's where we think that

7    there's a fundamental misunderstanding, her inability to

8    understand the nature of addiction, by the government, that this

9    isn't something that she chose.  If she could choose a different

10   path, she would have, but this is something that she's dealing

11   with head-on.

12       The first thing that she would think about when she woke

13   up -- sometimes it was in the morning, sometimes it was in the

14   afternoon -- but the first thing she would think about was where

15   she's going to get drugs.  It wasn't about "Am I going to take

16   my kids to school?  Am I going to pack up their lunch?  What am

17   I going to do with them after school?"  Those weren't thoughts

18   on her mind.  That was easy to predict.  Any of us could have

19   predicted that.

20       So the parenting responsibilities fell on others; fell on

21   people like her father; her other family members, like cousins,

22   who took in her children.  And we know what happened.  She went

23   out -- she was stealing, and she -- I think it's almost fitting

24   that the crime that she committed was identity theft, because

25   I -- she -- I do not believe that she wanted to be herself.  She

1   wanted to be someone else, and she assumed those identities, and

2   I think that was -- that was an escape for her.  She just

3   wanted -- she was looking for happiness in the wrong places.

4        So I think the drug use and the identity thefts helped her

5   escape, pretend to be someone else, because in her own skin she

6   was depressed, and I don't think she valued her own life.

7        We believe that there is a better way to do justice than

8   what the government proposes, and that's what we've laid out, a

9   way that is consistent with what the advisory guidelines say can

10  be done, and that is one month in custody, and then the 23

11  months and a day on home detention.  I think it's important to

12  note that the government has not cited any case law to support

13  its position about how a term of imprisonment may be served.

14       And what we're proposing is a 24-month-and-one-day term of

15  imprisonment.  It is completely consistent with the plea

16  agreement, which was crafted by the government, and all terms

17  are to be construed against the government, because they are the

18  entity that wrote this contract.

19       So as far as the implication that there is some type of

20  breach of the plea agreement, we are asking -- we are asking for

21  a term of imprisonment.  We're not asking for anything other

22  than that.

23       I think it's also important to ask the question:  When are

24  we going to learn that sending nonviolent offenders who have

25  drug addiction, who are addicted to drugs and have mental health

1    issues, when are we going to learn that prison does not work?

2    It doesn't reduce recidivism.  It continues the cycle of

3    addiction not only for Melissa, but, potentially, for others

4    around her who she is trying to support now.

5            I think importantly here, it separates families.  If this

6    were in a vacuum and Melissa didn't have children, I think two

7    years of actual prison would be easier for her than being

8    separated from her children now.

9            So the harm for Melissa, it's the harm to her children and

10   what is going to happen with them, because that is uncertain.

11   And what we're going to be doing is separating her and her

12   children from a stable environment that they have now and

13   putting them into instability.  And when are we going to learn

14   that separating families does not work, when we have someone who

15   is stable and who has learned what her issues are?

16           The policy of sending parents to prison increases that

17   likelihood that a future generation ends up in the same place.

18   And prison as a tool for justice is just simply not the answer

19   in this case.  It isn't.

20           As I mentioned, I think the disconnect here is that the

21   government doesn't understand how addiction works.  And the

22   government did have the opportunity to see Ms. Godsey's

23   progress.  I think if we look at the government's response to

24   the defense memo, the government notes that it's familiar with

25   Melissa's history with substance abuse, the fact that she has

1   young children, and that she's done well on bond.

2        In its sentencing memo, the government says that its

3   request for prison time is driven by two factors.  One is,

4   basically, Melissa has never served any time in custody before.

5   I think she served eight days in custody over ten years ago, and

6   then served the remaining 30 days on home detention, and then

7   around 2010, she served about 90 days on home detention.  That's

8   while she was at Evergreen, where she served those 90 days.  So

9   that's one of the factors that the government cites.

10        And then, apparently, the government states that -- the

11   fact that she doesn't take care of her young children was

12   another factor that seemed like the government was stating

13   there.

14        At the same time, the government says that it hopes that

15   Melissa is able to turn the positive gains into a lasting change

16   for the better, and the government's answer is to send her to

17   prison, actual prison, and separate her from her children for

18   two years.

19        We believe that the government's position is archaic, it's

20   cruel, and it implies that it doesn't understand how addiction

21   and treatment works.

22        We think that it's important to look at the current

23   political environment.  We have an administration that openly

24   creates and supports policies, with the knowledge that those

25   policies destroy families by separating children from their

1    parents.

2        We look at the Holder memo under the Obama Administration.

3    That said that, "Equal justice depends on individualized

4    justice, and smart law enforcement demands it."  It instructs

5    that charging decisions, plea agreements, and advocacy at

6    sentencing must follow from an individualized assessment of the

7    facts and circumstances of each particular case.  The memo

8    required charging decisions to, quote, be informed by reason and

9    by the general purposes of criminal law enforcement; punishment,

10   public safety, deterrents, and rehabilitation.

11       On May 10, 2017, the U.S. Attorney's Offices across the

12   country received what's now known as the Sessions memo.  It

13   rescinded the Holder memo, and, with it, we believe equal

14   justice that focuses on individualized justice.

15       The Sessions memo required federal prosecutors to pursue

16   the most severe penalties possible, including mandatory-minimum

17   sentences.  I think at the time civil rights groups, Republican

18   lawmakers, even other conservatives condemned that policy, that

19   it was taking the nation backward.

20       Former Attorney General Holder said that it was done on

21   crime, and because it takes a cookie-cutter approach that has

22   only been proven to generate unfairly long sentences that are

23   often applied indiscriminately and do little to achieve

24   long-term public safety.

25       At the time, the director of the ACLU's Campaign For Smart

1   Justice warned that the Sessions policy would, quote, rip apart
2   families and communities.
3       At the time, Attorney General Sessions responded to that
4   criticism, and he disputed the idea that prosecutors would
5   unfairly punish nonviolent offenders, nonviolent offenders like
6   Ms. Godsey.
7       We believe that, through its prosecution of Ms. Godsey and
8   its objection to allowing her to serve a term of imprisonment on
9   home detention, the government is following through with
10  conservative policies that separate families and make the
11  communities less safe in the long term.
12      And we believe that in this situation, the government is
13  even calling for a sentence that Attorney General Sessions
14  promised against; that's unfair punishment of nonviolent
15  offenders.
16      You know, I don't want you to get my point wrong.  Melissa
17  committed crimes.  She committed a lot of crimes.  She stole
18  from people.  She stole money, and she pled guilty to these
19  offenses.  We're not making excuses for it.  You're going to
20  hear from Melissa.  She's going to take full responsibility.
21  She, from the beginning of this case, told me that she wants to
22  take full responsibility, she wants to pay back her victims, and
23  do the best that she can for her children.
24      The government concedes that Ms. Godsey is a nonviolent
25  offender, concedes that she's done well on pretrial release and

1    knows that her children will be separated from her, with an

2    unknown future, but it still holds to its mandatory minimum and

3    objects to allowing her to serve the 23 months and a day on home

4    detention, which we believe is consistent with the guideline

5    definition of "term of imprisonment."

6         So the government's had the ability to see Ms. Godsey's

7    progress, as I've noted.

8         I think that the message here is that the government is

9    telling Melissa that the cost of incarcerating her for two

10   years, a cost that advances its need to deter specifically and

11   generally, is a cost that outweighs the benefit of keeping her

12   three young children together with a mother who's receiving the

13   most effective treatment for drug addiction and mental-health

14   issues.

15        We're asking for methods that are proven to work, rather

16   than methods that have failed in the past.  Those failed

17   policies and the collateral consequences from them, which the

18   government continues to defend in Melissa's case, resulted, in

19   the past, from a separation of families and a cycle that we see

20   through the criminal justice system across America today.

21        I think it's also important to look at how well Melissa has

22   done on pretrial release.  And it's important to look -- since

23   the government raised it in its memo about plea negotiations,

24   it's important to put those negotiations into context, because

25   the government raised that issue.

1    When this case first started, the government asked Melissa,

2  through me, to apply for DREAM.  We all knew that she was not

3  eligible.  That gave hope to Melissa that there would be some

4  alternative to actual prison and incarceration, but it also gave

5  her hope that she was going to get treatment and help.  So even

6  though she was not eligible, we applied, and Melissa maintained

7  hope.

8    I told her, "You're not getting in.  You have more than one

9  felony."  We don't know why she didn't get in, but we can guess.

10  And even though she did not get in, I think it's important to

11  look at how this process has played out and how she's reacted

12  from it.

13    She didn't give up.  She didn't quit.  She maintained her

14  medication-assisted treatment.  She accepted a diagnosis that

15  she was bipolar, and she got treatment for both.  She wakes up

16  now, and all day every day using drugs is not even something

17  that's on her mind.  She doesn't even think about it.  But we do

18  know that when her Suboxone levels that she's described go down

19  to four milligrams and a little bit lower than that, she feels

20  suicidal, and she feels like she's going to use drugs.

21    So when we learned that she wasn't eligible and that a

22  supervisor from the U.S. Attorney's Office and a criminal

23  chief -- and that's what's noted, I believe, in the government's

24  memo -- I invited the criminal chief to join me to go out to

25  meet with Melissa in Yakima, where she was getting treatment at

1    the time.  It's a great facility, they were very strict, and I

2    think that's where Melissa found her grounding.

3        I think up to this day, no one from the U.S. Attorney's

4    Office has met or talked to Melissa, but they make a

5    recommendation that what's necessary is that she serve time

6    behind bars, separated from her children.

7        After I met -- as noticed in the government's memo, after I

8    met with the chief, the criminal chief, they were unwilling to

9    drop the aggravated identity theft charge.  And, actually, the

10   government has been unwilling to drop any of the charges against

11   Melissa.  Her offer was "plead to everything," without dropping

12   one single count.

13       Eventually, the agreement was for a term of imprisonment of

14   24 months and a day, and we believe that leaves open the

15   possibility of how that term of imprisonment may be served.

16           THE COURT:  Counsel, let me point you to a particular

17   concern the court has, and I'll direct your attention to the

18   government's response to the defense sentencing memorandum at

19   Docket No. 41, and, specifically, on page 4, and I'll read it

20   exactly what it says, to refresh your memory.

21       "Sentencing Guideline 2B1.6 makes clear that the mandatory

22   term of imprisonment that is set by statute becomes the

23   guideline range.  A 24-month term of imprisonment falls within

24   Zone D of the sentencing table under every criminal history

25   category.  Because this is outside Zone D, defense counsel

1  relying on Guideline Section 5C1.1(c)(2) when requesting home

2  detention is simply wrong.  That section only applies to

3  sentences that fall within Zone D of the sentencing table."

4        So, counsel, how do you get around the guidelines that are

5  abundantly clear to this court in terms of what the requirements

6  are upon this court?

7             MR. GEIST:  Your Honor, the guidelines are advisory.

8             THE COURT:  I understand that.

9             MR. GEIST:  And are we on strong footing here?

10  Absolutely not.  We're asking for the court to do something

11  exceptional because the circumstances demand it.  We're asking

12  for Your Honor to do something that is -- that we feel like

13  Melissa will walk out of here, and justice will be done.

14  Holding her accountable, letting her pay back the money that

15  she's stolen from victims.

16        And, frankly, Your Honor, we aren't on strong footing here,

17  but we are asking Your Honor to give and -- to provide the

18  sentence that we're requesting.  If the government decides to

19  appeal that, then that's something that will happen.  If they

20  don't, then that's the way that Ms. Godsey will be able to serve

21  her term of imprisonment.

22        So we do realize that we are asking Your Honor to do

23  something exceptional here.

24             THE COURT:  Let me ask you another question, counsel.

25        One of the components of the Section 3553(a) factors is

1    avoiding sentencing disparity.  Now, I can ask the government, I

2    can also ask Probation.  But I've been on the bench for a

3    considerable time, counsel.  I'm not aware of any other

4    defendant that's ever received a sentence, under the aggravated

5    identity sentencing mechanism, where it allowed for a court or a

6    court permitted the type of sentence that you're recommending.

7         So how do we get around the fact that -- again, if you have

8    any other information, I want to hear about it.  But I'm not

9    aware of any other defendant that has gotten around the

10   mandatory term of aggravated theft.

11           MR. GEIST:  I do not know about aggravated identity

12   theft.  I do know that Judge Coughenour, in a case for

13   Mr. Pippen, Mr. Pippen had a 10-year mandatory sentence.  Judge

14   Coughenour sentenced Mr. Pippen to eight years in custody.  I do

15   not believe the government appealed that.

16        Your Honor also noted sentencing disparities.  I think it's

17   important to look at two cases I'm aware of, personally, that do

18   create the sentencing disparities that we're trying to avoid.

19   One is Joseph Gustavo Smith.  He had an extensive criminal

20   history.  He was -- his federal offense was possession of two

21   loaded firearms while he was running away from police officers.

22   He was a father -- single father of three children, a drug

23   addict, and I believe that there was no mandatory minimum, but

24   the government was asking for a term of imprisonment, I think,

25   of three or four years -- I can't remember -- but an extensive

```
 1    term of imprisonment, and Judge Zilly sentenced Mr. Smith to

 2    time served.

 3         Another case that --

 4         THE COURT:  Well, counsel, I want to compare apples

 5    and apples, because you referred to the Pippen case.  That did

 6    not involve a mandatory minimum.  I'm speaking about sentencing

 7    disparity about comparable or similarly situated individuals,

 8    where a court has not followed the aggravated identity theft 24

 9    months in prison.

10         MR. GEIST:  The Pippen case, Your Honor, did involve a

11    mandatory-minimum sentence.  The Smith case did not.  But in the

12    Pippen case, in front of Judge Coughenour, Judge Coughenour did

13    give a sentence below the mandatory minimum.  And there was, I

14    believe, at least in Judge Coughenour's mind -- I don't want to

15    speak for him -- but it seemed like there was a reason to go

16    below the mandatory minimum that did not involve 3553(e), and,

17    obviously, in that case, there could not be safety valve,

18    because it wasn't a drug case.

19         So can I give you another case for aggravated identity

20    theft?  I cannot.

21         We turn to the guidelines, and what the guidelines allow

22    for a term of imprisonment, and that's what we're asking Your

23    Honor to do, to provide that one month of actual prison time,

24    and then the 23 months and a day of prison on home detention.

25         THE COURT:  Counsel, before you go any further, let me
```

 1    hear from Probation.

 2         Are you aware of any circumstance that the court has asked

 3    about that's an aggravated identity theft conviction that

 4    resulted in anything other than the enforcement of the mandatory

 5    24 months of imprisonment?

 6              THE PROBATION OFFICER:  I'm not aware of a case in

 7    this district or in any other district.

 8              THE COURT:  How long have you been serving in the

 9    district?

10              THE PROBATION OFFICER:  Sixteen years, Your Honor.

11              THE COURT:  All right.  Thank you.

12         Counsel for the government, same question I've asked to

13    Probation and the defense.

14              MR. HOBBS:  No, Your Honor.

15              THE COURT:  Please continue.

16              MR. GEIST:  Thank you, Your Honor.

17         When the *Valencia-Mendoza* case came out in January, it

18    redefined what it meant to have a felony.  At that point, we

19    believed that Melissa no longer had any prior felonies, and that

20    she would be eligible for DREAM.  So this was after she'd

21    already pled guilty and we reapplied.  I told Melissa, "Do not

22    get your hopes up.  You're not getting in."  I think in her

23    mind, in her head, she knew she wasn't getting in, but in her

24    heart, while living at Hope Place -- she was living there with

25    other people who were in the DREAM program, and she heard about

1  it, and she couldn't help but getting her hopes up that we would

2  be able to find a way to get her into DREAM.  Unfortunately, she

3  did not get in, but she still has done exactly what she needs to

4  do.

5      She's been a good mother, and she's worked hard on her

6  sobriety and working with her doctors as far as

7  medication-assisted treatment.

8      And I think that's the theme that we have here; that she's

9  maintained that dedication, and it's been because of her

10  children.  So the two times that I've had the opportunity to go

11  out and visit with her in Yakima -- basically, all day with

12  her -- she was with her five-year-old son.  That was the only

13  one of her children living with her at the time.  The first time

14  I visited with her, her son was shy, was hiding behind her,

15  didn't have any kind of -- to me, it seemed like there wasn't

16  that confidence and that happiness that a young boy should have.

17      But when I went for the second visit, just a few months

18  after that, her five-year-old son was confident, playful, and he

19  was living in a safe and positive environment.  And he changed

20  because he was with his mother.

21      The fear here is what's going to happen to a five-year-old,

22  between the age of five and seven, with unknown circumstances,

23  where he's going to live, what's going to happen with him.

24  What's going to happen with a 12- and 13-year-old and two very

25  important years of their lives?

1        Her children have changed for the better because of her,

2    because she is in their lives, and that's what we're asking the

3    court to allow us to continue.

4        Your Honor, I've done everything that I can.  I've gone up

5    to the criminal chief.  I've filed two applications for DREAM.

6    I've done everything that I possibly could do to prevent

7    children, who are happy, from being separated from their mother.

8        We believe that Your Honor, even though, Your Honor, I hear

9    what you have said, what is the prior situation for something

10   like this has happened, Your Honor, we're asking -- you're the

11   only one who has the power to avoid an injustice here, and we're

12   hoping that you could be the first judge to say that a term of

13   imprisonment may be served in the manner that we are requesting,

14   in a way that holds Melissa accountable, in a way that's

15   consistent with the guidelines for the term of imprisonment.

16       And, Your Honor, I do know that Melissa would like to

17   address Your Honor, unless the court has additional questions.

18            THE COURT:  Just one last question, counsel, because

19   the issue that you've raised goes beyond just aggravated

20   identity theft.  It really gets to the heart of what

21   mandatory-minimum terms are supposed to mean.

22       Wouldn't you agree with the court that the determining

23   factor there is what Congress has implemented as law and what

24   Congress has intended in terms of what "mandatory minimum" is

25   supposed to mean, and wouldn't you, essentially, be asking the

1   court to circumvent the laws of Congress?  I'm talking about

2   Congress that precedes the last two presidents.

3           MR. GEIST:  Your Honor, I think I have two responses

4   to the court's question.  The first is that the statute calls

5   for imprisonment.  The guidelines define what a term of

6   imprisonment may be.  So we think that those two things are

7   consistent.

8       We are asking for imprisonment for 24 months and a day.

9   It's the way that it's implemented that we're asking Your Honor

10  to do.

11      The other point I would make is that if we look at the

12  aggravated identity theft statute and if we go back and look at

13  what it was intended for, a large bulk of what aggravated

14  identity theft statutes were meant for was for terrorism, not

15  for drug addicts who are, basically, single mothers who commit

16  thefts because they're addicted to drugs and they have

17  mental-health issues.

18      So if we look at the intent of Congress, as far as

19  aggravated identity theft, that's what we're dealing with.  I

20  think a large part of why they implemented this law was to

21  prevent terrorism.

22      So that would be my response, Your Honor.

23      Unless Your Honor has additional questions, Melissa would

24  like to address Your Honor.

25          THE COURT:  I have no additional questions.

1          Ms. Godsey, your lawyer has spoken for you.  You're not

2    required to speak, but if there's something you'd like to say,

3    please step to the microphone.

4          THE DEFENDANT:  I'm going to cry before I get started.

5          Okay.  I want to start by saying that I know that I'm the

6    reason why I'm in this position today.  I know that it's my

7    choices that is separating me from my children.

8          I desire to pay back every victim that I had an impact on,

9    and I would like to do that as quickly as possible, to resolve

10   anything for them.

11         I've had the opportunity to get sober, and I want to thank

12   the courts for coming in when they did, because I reached [sic]

13   on to everything that they gave me, and I took every opportunity

14   to change my life.

15         I was just begging for help at that time, when I got

16   arrested, and the judge who let me out on bond asked me to do my

17   best and get treatment, and he sees the pattern in my history

18   that drug abuse needs treatment, and I'm just grateful that I

19   got the opportunity to get treatment this past year and that I

20   wasn't held in custody.

21         I've done more than just get treatment.  I've gotten my

22   kids back, and I built something, like a real foundation, to

23   live a good life.

24         I believe what's different this time around is that I have

25   medication-assisted treatment, which takes using out of the

equation for me.  When I take Suboxone, I do not think about using drugs.  It's not even a side thought.  It's just not possible for me.  It has a blocker in it.  It would make me sick if I did.

And so I've been able to get a clear mind and work and figure out what my mental illnesses are and try medications that work to fix it.

And right now I feel lucky and grateful that I get to speak from my heart and speak clearly.  And I guess what I mostly want to ask of you is to not separate me from my kids.  If there's any way to not have that happen where I could still take accountability and responsibility, I would greatly appreciate it.

I have a five-year-old in Colton, and when I went to treatment in Yakima, he used to hate going to bed because he was afraid that when he would wake up, I wouldn't be there, because that's what would happen when I would leave him at my dad's.  I would put him to bed and leave when he was sleeping, and I wouldn't be there for him when he woke up.

He's about to turn six and start kindergarten, and he is a confident, happy, thriving boy who goes to bed on time.  He doesn't have bad dreams anymore, and he is just doing great.

And I have Mason, whose birthday was yesterday, and he just turned 12, and he's a good-hearted boy.  And when I started using, I quit working with him, and so he fell behind in

1    reading.  So he's, like, two years behind, struggling in school.

2    And this past year, he's caughten [sic] up, and he's going to

3    start middle school almost caught up completely, when he was two

4    years behind.

5         And then I have an almost-13-year-old daughter, and she's

6    just beautiful, and she's starting to grow up, and I would hate

7    to miss this part of her childhood.  I really want her to have a

8    mom for this next year and a half, two years.  I think that she

9    needs it, and without one, I don't know what's going to happen.

10        Yeah.

11        I have a 17-year-old, who lives with his dad, and he's

12   okay, and he'll be okay there because his dad has had him for

13   six years.  And I just started building our relationship again,

14   and we write letters and we talk on the phone at least twice a

15   week, and that's progress, because I went two years without

16   really talking to him.

17        So I've done -- since I got in trouble, I've done

18   everything that I could with what I had, and I'm grateful for

19   the opportunity for this past year, to have made all the strides

20   that I have.  And I've come so far that -- I'm just proud of

21   myself, and I'm proud to be their mom.

22        That's all.  Thank you.

23             THE COURT:  All right.  Thank you.

24        If there's nothing further to come before this court,

25   Ms. Godsey, this court is required to calculate an appropriate

1    guideline range, then to look at any traditional departures or

2    variances that would be appropriate in view of the facts and

3    circumstances, and I've done that as well.

4        In fashioning a sentence, the court must look at and

5    consider all the Section 3553(a) factors of the sentencing

6    guidelines.  It's my practice to go through those factors so

7    that you have a clear understanding of what factors the court

8    considered in assessing what the proper sentence should be in

9    this matter.

10        When I look at your history and characteristics -- it's

11    where we begin with the guidelines -- there are aggravating and

12    mitigating factors.  The aggravating factors are that you had

13    several prior convictions for theft or related offenses for the

14    exact same type of conduct, and there's been no stepping back or

15    relief under those circumstances.  If anything, it's progressed

16    with increased level of commitment to being involved in that

17    type of activity.

18        Now, the mitigating factor behind the criminal activity is

19    the fact that you have substance-abuse and mental-health issues,

20    as well as the degree of addiction that you currently suffer and

21    experience.

22        The court also looks at the fact that you were raised in a

23    challenging home environment.  The court doesn't need to go into

24    the details or the circumstances about that, as it's clearly

25    reflected in the presentence report.

1    The court also looks at the fact that you have young

2    children, and the need for you to be present and available for

3    your young children.

4    The court also looks at the fact that your pretrial conduct

5    has been exceptional, in terms of all the work that you've done

6    and the dedication and the commitment to your treatment.

7    The court looks at the nature and circumstances of the

8    current offense.  The court finds that all the factors here are

9    all aggravating factors.  That includes that you defrauded the

10   bank by making fraudulent charges and using fraudulent

11   identification, as well as the type of equipment that was

12   involvement, and but for law enforcement's involvement, this

13   activity would have continued, and the damages and loss would

14   have been aggravated and extreme and continued.

15   The court also looks at the fact that this was a long-term

16   pattern of mail fraud, bank fraud, and this type of theft

17   activity.  This hasn't been something of recent occurrence, and

18   it appears to the court that the primary reason you stopped was

19   because you were caught.

20   The court also looks at the need for the sentence to

21   reflect the seriousness of the offense.

22   Now, I realize that the vehicle was able to be sold and the

23   outstanding restitution isn't as large.  But, nonetheless,

24   what's troubling for the court is that when you did have

25   resources and you did have money, although it was ill-gotten

1  gain, is what you were doing with the resources.  You went out

2  and bought a car and the way you were spending the money on

3  other events.

4       The court also looks at the need to promote respect for the

5  law and also to provide just punishment.

6       The court looks at how long and the repetition of what you

7  were doing and the continued pattern and continued criminal

8  activity, and your behavior.  Now, I recognize that some of that

9  may have been driven by mental-health issues and drug addiction,

10 but, nonetheless, that fact demonstrates to the court that you

11 still didn't demonstrate respect for the law, in your own words,

12 until you were caught.

13      The court also needs to provide adequate deterrents so you

14 recognize and clearly recognize you can't be involved in this

15 type of activity.  If there's treatment or whatever services

16 that need to be obtained, you have to engage in that fully in

17 order to take advantage of you staying away from future

18 activity.

19      The court also has to protect the public from further

20 crimes.  You've seen the victim-impact letters in terms of the

21 devastation that that had on people, the long-term impact it had

22 on their credit, and the fear it continued to place on what

23 other catastrophic circumstances would be with the loss of their

24 identity.

25      The court also recognizes you need to be provided some form

 1    of treatment in your sentencing alternatives.

 2         And, lastly, to avoid sentence disparity.  And you can see

 3    the questions I had for counsel were designed to try and find

 4    out if your case is truly unique, or if there's anything

 5    different about the circumstances that you present to this

 6    court.

 7         So with all these facts, the court will first place you on

 8    a five-year term of supervised release, with the standard and

 9    special conditions exactly as stated in the presentence report.

10         Each of those conditions recommended by Probation will be

11    applicable, and you'll be expected to comply with them exactly

12    as they're provided.

13         Statutory fines for this offenses range from $7,500 to

14    $1,750,000.  The court waives these fines.  I find you don't

15    have the ability to pay a fine.  The court will, however, impose

16    a special assessment fine for all counts.  That amounts to $600,

17    and that amount is due immediately.

18         Counsel for the government has articulated an amount of

19    restitution in the amount of $24,695.58.  I'll confirm with

20    counsel for the defendant that that's an accurate amount, and is

21    your client willing to accept that that's the proper amount of

22    restitution?

23              MR. GEIST:  Yes to both questions, Your Honor.

24              THE COURT:  Having imposed all the other conditions of

25    sentence, the only remaining issue is the imposition of any

1    custodial time.

2         Now, your lawyer has made a couple of requests, and your

3    lawyer has already indicated that he recognizes he's not on

4    solid footing.  The reason I asked the question about mandatory

5    minimums is because your lawyer is asking this court,

6    essentially, to defy, in a significant way, what Congress has

7    imposed.  Now, whether the statutory history talks about

8    terrorist activities, nonetheless, the primary purpose of that

9    statute was to avoid people continuing to steal the identity of

10   other individuals, because of the rapid and growing concern of

11   the impact that that has on this country.

12        The mandatory minimums of that statute were designed for

13   one specific reason.  If other activity of that individual

14   didn't stop them by way of some form of limited punishment, then

15   to impose a minimum amount of time that individual would have to

16   serve in prison.

17        In some ways the court sees your remedy is not so much with

18   this court as it is with Congress in terms of defying or

19   clarifying for this court how to interpret a mandatory minimum,

20   other than imposing exactly what a mandatory minimum calls for.

21        Now a few words not just to you but to your family.

22        The fact that your mother is being sentenced today does not

23   mean she is a bad person.  Your mother is a good person.  She's

24   demonstrated that to you by the fact of the sacrifice that's

25   she's currently making right now to make changes in her life and

1   to make changes in your life for the long haul.

2        This is an opportunity for your mother to grow in different

3   ways so that when your mother does come back to you, her history

4   is her past.  Her history doesn't dictate her future.  And if

5   she continues to grow and she continues to take advantage of the

6   drug-treatment programs that are available for her, when she

7   comes back to you, she'll be a far better parent, and the

8   opportunity to restore your relationship will be there.

9        What I strongly encourage all of you to do is not to give

10  up on your mother.  She's had some roadblocks and stumbling

11  blocks in her life.  That does not mean that she does not love

12  you deeply and care about you deeply.  So you have to make sure

13  you continue to provide that love to your mother in ways beyond

14  your imagination right now, whether that's writing letters,

15  whether that's going to visit her as much as you can.  The

16  bottom line is, do not give up on your mother.  She's still a

17  good woman.

18       The court believes that the appropriate sentence in this

19  case is to follow the recommendation of the government and

20  probation.  That's 24 months on the aggravated identity theft,

21  one day for the following, which is to run consecutive.

22       The court will follow the recommendation regarding -- was

23  there a designation, counsel?

24            MR. GEIST:  Your Honor, we don't know where Ms. Godsey

25  would like to request designation.  We're hoping that Your Honor

1    recommends that she continue with medication-assisted treatment

2    while she's in BOP custody.  I provided Your Honor with another

3    case out of Massachusetts.  We're hoping over the next -- until

4    September 30th, to allow a turn-in date for September 30th so

5    that we can work with the Bureau of Prisons to figure out,

6    first, whether they will allow her to continue with

7    medication-assisted treatment.

8         We have been having conversations with the ACLU about the

9    possibility of their representation, if the Bureau of Prisons

10   does not allow Ms. Godsey to continue with MAT; potentially to

11   have them become involved in future, potential litigation.

12        So right now, I don't think we're in a position to make

13   that request, other than to ask Your Honor to make a

14   recommendation to the BOP to continue Ms. Godsey's

15   medication-assisted treatment, and then we're hoping that Your

16   Honor can order the BOP to provide Your Honor with updates on

17   how they're going to effectuate that recommendation.

18             THE COURT:  And, counsel, are you aware -- and perhaps

19   probation can provide some input -- are you aware of any BOP

20   facilities that do provide for MAT therapy?

21        My understanding and I'm confident that the Federal

22   Detention Center does not authorize -- does not provide Suboxone

23   for in-custody individuals.  I believe that there may be other

24   facilities around the country that provide that, but I don't

25   know where the weight of your preference would be; to be a

1    facility that provides MAT, as opposed to being closer to

2    family.

3         Have you had that conversation with your client?

4         MR. GEIST:  I have, Your Honor.  Ms. Godsey, while

5    she's in custody, there -- she has two priorities.  One is to

6    continue with medication-assisted treatment, and the second

7    priority is to obtain the best drug treatment that she possibly

8    can.  Those are her priorities, Your Honor.

9         THE COURT:  All right.  Let me ask Probation.  Are you

10   aware of any facilities that currently provide or authorize

11   medication-assisted treatment?

12        THE PROBATION OFFICER:  At this time, I'm not aware of

13   any facilities that do so.  The only thing I am aware of is,

14   Officer Van Flandern said that there is a judge on the East

15   Coast who has recently recommended that the Bureau of Prisons

16   offer MAT, but at this point that has not happened.  So I think

17   we're in the beginning stages.  And like I said, at this point a

18   facility has not yet offered Suboxone.

19        THE COURT:  Okay.  I'm going to authorize a report

20   date of September 30th.  This should give you ample opportunity

21   for your client to continue in the current drug treatment, if

22   you're in a position to try and get more of a clear and positive

23   direction from BOP regarding the authorization for BOP.

24        So for the government's direction for the J&S, it should

25   include "the court recommends MAT," and, counsel, I'm not going

1    to include a recommendation for where she serve her sentence.  I

2    can put "MAT and a facility as near as possible to family."

3    Would that be acceptable, counsel?

4              MR. GEIST:  I think that's a good idea, Your Honor.

5    Thank you.

6              THE COURT:  Now, "as near to family," I'm not going

7    define "family."  "As near as she can be to her children," would

8    that be appropriate?

9              MR. GEIST:  I think probably "to Seattle."

10             THE COURT:  All right.  We'll put "Seattle," counsel.

11   Make that modification.

12             MR. GEIST:  Your Honor, I did provide the court one of

13   the exhibits.  It is a joint status report regarding Stephanie

14   DiPierro.  She received a one-year and one-day sentence, and she

15   was designated to FMC in Carswell, Texas, and it was in a joint

16   status report, and that was something that the Bureau of Prisons

17   worked out, that her -- Miss DiPierro's report date was extended

18   until the BOP could determine which facility could facilitate

19   methadone treatment, continuing MAT, and they came up with a

20   joint agreement.

21        We're hoping that that's what happens in Ms. Godsey's case;

22   that we can work with the BOP to figure that out.

23        We appreciate the extension, Your Honor.

24             THE COURT:  Are you asking for a specific inclusion in

25   the judgment, counsel?

1          MR. GEIST:  We're not asking for specific inclusion,

2    Your Honor.  I was just trying to answer Your Honor's question

3    about whether we're aware of any facilities where MAT treatment

4    is available.

5          THE COURT:  Well, I've set the report date of

6    September 30th.  If you learn additional information that needs

7    to be considered or that might affect her opportunity for

8    continued treatment, you can ask the court for a hearing to be

9    set regarding report date, and if that needs to be extended, the

10   court may consider that at that point in time.

11         MR. GEIST:  Ms. Godsey appreciates that, Your Honor.

12         THE COURT:  All right.

13      Counsel for the government, are you in a position to

14   challenge the court's determination?

15         MR. HOBBS:  No, Your Honor.

16         THE COURT:  Counsel for the defendant, are you in a

17   position to challenge the court's determination?

18         MR. GEIST:  Other than the objections we've already

19   maintained, no, Your Honor.

20         THE COURT:  All right.  Then the court makes the

21   finding that the overall sentence is reasonable and efficient

22   but no more than necessary to carry out the objectives of

23   sentencing.

24      Ms. Godsey, I want to give you your rights on appeal.

25   Please pay close attention as I explain these rights to you,

1    before counsel gives you the judgment.

2        It's my understanding that in paragraph 12 of the plea

3    agreement, you waived your rights on appeal.  Any rights on

4    appeal are exactly as stated in that document.

5        In addition to those rights, I wish to advise you that you

6    also have the right to challenge your lawyer's effectiveness.

7    If you wish to appeal your sentence, it's very important that

8    you tell your lawyer that's exactly what you wish to do.  He can

9    explain to you any issues that are appealable and any issues

10   that might survive.

11       Now, if you wish to appeal the sentence and you cannot

12   afford the filing fee for the Court of Appeals, you can ask me

13   to waive it, and I will direct the court clerk to prepare and

14   file a notice of appeal at no cost to you, at your request.

15       With few exceptions, any notice of appeal must be filed

16   within 14 days of the judgment.

17       Lastly, the waiver does not preclude you from bringing an

18   appropriate motion pursuant to Title 28, United States Code

19   Section 2241 to address the conditions of your confinement or

20   the decisions of the Bureau of Prisons regarding the execution

21   of your sentence.

22       Do you understand each of these rights?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  All right.  Counsel, you may present the

25   judgment to defense, then Probation before the court.

1           MR. HOBBS:  Your Honor, just a few minor housekeeping

2     things.  I've indicated that the report date is before 2:00 p.m.

3     on September 30th, and I've checked that box.  In paragraph 13

4     of the special conditions, I've included the total restitution

5     amount, $24,695.58.  There's Attachment A that reflects that.

6     And, finally, I'd ask if the court is signing the amended order

7     of forfeiture and wants that fact reflected in the judgment.

8           THE COURT:  It may, counsel.  Are you presenting an

9     additional order of forfeiture, counsel, or the one that was

10    pre-submitted?

11          MR. HOBBS:  I submitted one to the in-court moments

12    ago.

13          THE COURT:  Why don't you check and make sure this is

14    the same one.  That's the one I had before.  You may have to

15    make a modification.

16          MR. HOBBS:  I have a copy.  Here's a copy of the

17    amended order of forfeiture.

18          THE COURT:  I have it, counsel.

19       Any objection to the amended order of forfeiture?

20          MR. GEIST:  No, Your Honor.

21       It conforms with Your Honor's oral rulings.

22          MR. HOBBS:  May I approach?

23          THE COURT:  Show it to the probation officer, counsel.

24          MR. HOBBS:  Your Honor, I've also added the amount of

25    restitution on the top of page 7 of the judgment.

1          THE COURT:  Thank you.

2      I take it there are no counts to be dismissed?

3          MR. HOBBS:  That's correct, Your Honor.

4          THE COURT:  And, counsel, there are strikeouts that

5   appear on page 2.  I'll place my initials next to the changes.

6   And, counsel, I believe on page 2 it also reflects, under, "The

7   defendant is hereby committed to the custody of the United

8   States Bureau of Prisons," it indicates "one day, Counts 1, 2,

9   3, and 6."  The box was not checked for "consecutive to."  I'll

10  check that box at this time.  Any objection?

11          MR. HOBBS:  Thank you, Your Honor.

12          MR. GEIST:  No, Your Honor.

13          THE COURT:  And for the record, the court will note

14  that the interest is going to be waived.

15      I have reviewed the judgment.  It does reflect the court's

16  oral ruling, and I have signed it.

17      If there's nothing further, we're in recess.

18          (The proceedings concluded at 2:38 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E


       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


       Dated this 30th day of July 2020.


              /S/  Nancy L. Bauer

              Nancy L. Bauer, CCR, RPR
              Official Court Reporter